**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

**CHRISTOPHER JEROME BENTON,**

**Plaintiff,**

**vs.** **Case No. 4:11cv254-MP/CAS**

**DR. TORRES-GONZALEZ,**

**Defendant.**

**_________________________________/**

## REPORT AND RECOMMENDATION

Plaintiff is a state prisoner proceeding pro se in this civil rights action filed under 42 U.S.C. § 1983. Plaintiff's amended complaint, doc. 9, alleged that the Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. At the time of the events in question (April through August of 2010), Defendant was a physician employed by the Florida Department of Corrections. Doc. 35. At the conclusion of the discovery period, doc. 32, Defendant filed a motion for summary judgment. Doc. 35. Plaintiff was advised of his obligation to respond to that motion pursuant N.D. Fla. Loc. R. 56.1 and FED. R. CIV. P. 56. Doc. 36. Plaintiff's response, doc. 37, was timely filed and the motion is ready for a ruling.

## I. Legal standards governing a motion for summary judgment

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co., 475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129 S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

## II. The relevant Rule 56(e) evidence

On November 12, 2009, Plaintiff was transferred to Wakulla Correctional Institution and the Health Information Transfer/Arrival Summary provided that Plaintiff was currently being treated for "Asthma and HTN."[1] Doc. 35, Ex. A (doc. 35-1).[2] At the time of his transfer, Plaintiff was prescribed Claritin, Enalapril, and an Albuteral inhaler, and had keep on person (KOP) passes for all three medications. *Id.* Of importance to this case is the fact that the prescription for Enalapril was written by ARNP McDonald on November 4, 2009, just prior to Plaintiff's transfer. Ex. C (doc. 35-3 at 2). The Summary indicated Plaintiff had a pending appointment at the Chronic Illness Clinic,

---

[1] HTN is a common medical abbreviation for hypertension. Doc. 35 at 3; http://www.medilexicon.com/medicalabbreviations.php.

[2] Hereafter, all references to exhibits are to those attached to document 35, unless otherwise noted. References are made to the paper copy first, followed by a reference (in parenthesis) to the corresponding document and page on the electronic docket. Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

followed by the initials "CC & RC."[3] Ex. A (doc. 35-1). The Summary reports that Plaintiff did not "have a current medical, dental, or mental health complaint." *Id.* On November 12, 2009, the date Plaintiff arrived at Wakulla C.I., his blood pressure was 134/90. *Id.*; *see also* Plaintiff's affidavit (doc. 37, Ex. A at 2).

Defendant Torres-Gonzalez evaluated Plaintiff's medical condition five months later on April 27, 2010. Ex. B (doc. 35-2). The medical record indicates Plaintiff reported to the Defendant that he was feeling fine, and he denied having a cough, fever, shortness of breath, chest pain, palpitations, weakness, headache, dizziness, or visual disturbance. *Id.* at 1. Plaintiff's current medications at the time of the examination were Enalapril and an Albuterol Inhaler,[4] and his blood pressure was 140/80. *Id.* Plaintiff reported using his Albuterol Inhaler the night before. *Id.*

Defendant's evidence is that Defendant Torres-Gonzalez determined that Plaintiff was "stable under his conditions" and decided to continue Plaintiff's current medications for another year. *Id.* at 2. Plaintiff was to continue taking 10 milligrams of Enalapril by mouth once a day every day for the next twelve months and continue with two puffs on the Albuterol Inhaler four times a day as needed for the same period of time. *Id.* at 2. Defendant stressed to Plaintiff the need to stop smoking, get exercise, and avoid "irritant/fat/salt intake," and to be compliant with his medications. *Id.* On April 27, 2010, the same day as the examination, the Defendant wrote Plaintiff a prescription for a one year supply of both Enalapril and Albuterol. Ex. C (doc. 35-3).

---

[3] CC stands for Cardiovascular Clinic. Ex. B at 1 (doc. 35-2).

[4] The medical records indicate that Plaintiff's prescription for Claritin, a prescription he had upon his arrival to Wakulla C.I., was given on August 12, 2009, for 120 days. Ex. C (doc. 35-3 at 2). It would have expired by the date of this examination.

The record notes that Plaintiff was to have a follow-up visit in seven months, but sick call was open to Plaintiff for any problems. Ex. B at 2 (doc. 35-2).

Plaintiff's evidence, however, is that when he spoke with the Defendant in his examination, Plaintiff reported that "his prescription for 10 mg of Enalapril was not working all that well for him and [Plaintiff] requested something a little stronger like 'Clonidine.'" Doc. 37, Ex. A at 5 (hereinafter Plaintiff's affidavit). Plaintiff said Defendant Torres-Gonzalez "became upset with Plaintiff and stated in a belligerent manner 'You are wasting my time. I am not changing your medication, continue to pester me and your prescription may not get filled.'" *Id.* Plaintiff said that he did "not want to provoke Defendant into doing anything with his blood pressure medication so he left her office without a word said . . . ." *Id.* Plaintiff said he "never received the prescription sent by Dr. M. Nichols in the month of May, 2010." *Id.* at 6. Plaintiff contends that had the Defendant "renewed Plaintiff's medications as she said on April 27, 2010, Plaintiff would not have suffered migraine headaches; blurred vision; heat flashes; and dizziness." *Id.*

Plaintiff's pharmacy records which provide a "fill date" of medications indicate that Plaintiff received a refill of Enalapril on April 29, 2010, and again on May 27, 2010.[5] Ex. H at 1 (doc. 35-8). The name attached to the medication is M. Nichols, who worked at Santa Rosa Correctional Institution and prescribed that medication for Plaintiff prior to his transfer to Wakulla Correctional Institution. Doc. 35 at 4; Ex. C at 2 (doc. 35-3). As was noted above, the "physician's order sheet" demonstrates the prescription was

[5] By Defendant's calculation, Plaintiff would have exhausted his supply of Enalapril pills on or about June 26, 2010, assuming Plaintiff was compliant with the prescription instructions. Doc. 35 at 5.

written by M. Nichols, ARNP, on November 4, 2009, just prior to Plaintiff's transfer. Ex. C at 2 (doc. 35-3). This evidence establishes that immediately after Plaintiff's examination with the Defendant on April 27th, Plaintiff received a refill of his medication on April 29th and the following month, on May 27th.

The evidence also shows that on July 17, 2010, Plaintiff went to sick call and was evaluated by Nurse R. Clardy for complaints of sinus problems, stuffy nose, and athlete's foot. Ex. D (doc. 35-4). Plaintiff requested that his Claritin prescription be renewed, so the nurse directed that Plaintiff's "chart [be sent] to clinician for Claritin refill." *Id.* Nurse Clardy noted in Plaintiff's medical record that Plaintiff was currently prescribed Albuterol, Enalapril. *Id.*

Thereafter, a notation on the SOAPE[6] Comments provided: "Chart forwarded to Mrs. London for re-order of Albuterol & Enalapril."[7] *Id.* at 2. On July 20, 2010, Plaintiff's chart notes that Enalapril and Albuterol renewed for one year. Ex. E (doc. 35-5). The medical records confirm that on July 20, 2010, he was prescribed "Enalapril, 10 mg, poqd"[8] and Albuterol by ARNP MacDonald. Ex. C (doc. 35-3 at 1). There is no record that Plaintiff ever received a Claritin refill after sick call, and the pharmacy records show that Plaintiff had been receiving Loratadine[9] every month between May 2009 and May

---

[6] "SOAPE is an acronym for 'Subjective, Objective, Assessment, Plan, Education." Doc. 35 at 17.

[7] That comment is incorrect because Plaintiff requested a Claritin refill. Ex. D.

[8] QD means every day, and PO means by mouth, orally. www.medilexicon.com. Enalapril is an ACE inhibitor used to treat hypertension and congestive heart failure. www.drugs.com.

[9] Loratadine is the generic name for Claritin, an antihistamine.

2010, but the last "fill date" was May 27, 2010, two months prior to Plaintiff's accessing sick call. Ex. H at 1 (doc. 35-8). Furthermore, the renewal of Enalapril and Albuterol for one year would be unnecessary in light of the prescription written by the Defendant on April 27, 2010, and would be incorrect considering Plaintiff had requested Claritin.

Somewhat contrary to Defendant's evidence is Plaintiff's assertion in his affidavit that he was seen on July 17, 2010, "by Nurse Clardy for the sick-call Plaintiff accessed back in June 22, 2010."[10] Plaintiff's affidavit, at 6. Plaintiff reports that he told Nurse Clardy he "had not received his high blood pressure medication in almost 2 months." *Id.* Plaintiff states that Nurse Clardy went to check with the pharmacy about the "medication and when he returned, [Nurse Clardy] informed [Plaintiff] the prescription was never filled, but that he would send for it." *Id.*

Nearly two weeks later, on July 29, 2010, Plaintiff submitted an "inmate request" to medical in which he said, "I'm writing because I've been trying to [sic] my medication but the officers won't allow me [to] come to medical." Doc. 37, Ex. E. Plaintiff reported that his blood pressure was high and he was getting headaches and needs his

---

[10] In his affidavit, Plaintiff said that on "June 22, 2010, two (2) months after seeing the Defendant, Plaintiff accessed inmate sick-call in his dorm due to not receiving his medication." Plaintiff's affidavit, at 6. It is unclear what Plaintiff means by stating he "accessed inmate sick-call in his dorm" because judicial notice is taken of the Department's Inmate Orientation Handbook which provides that an inmate "may communicate [his] health concerns to medical staff by reporting to routine 'sick call', by declaring a 'medical emergency' to staff, or by submitting a written request to health care staff." Accessible at www.dc.state.fl.us. There is no explanation as to how Plaintiff "accessed sick-call" on June 22nd. Further, there is no supporting evidence which demonstrates he submitted an inmate request for a sick call appointment, or that he went to medical for sick call. Furthermore, it does not appear that Plaintiff would have yet run out of his medication by June 22nd, *see* fn.5, p. 5, nor does Plaintiff clearly state when his prescription was depleted. Thus, while the evidence is disputed as to the reason for Plaintiff's sick call visit to medical on July 17, 2010, it is undisputed that Plaintiff was seen in sick call by Nurse Clardy.

medications, but had not been placed on the call-out to pick them up. *Id.* Plaintiff requested that he be placed "on the call-out to pick up" his medication." Doc. 37, Ex. E. The health services administrator responded to Plaintiff's request on August 2, 2010, and told Plaintiff that it was his "right to attend sick call with your concerns." *Id.* Plaintiff was advised to review the bulletin board or the inmate information manual for the proper procedures. *Id.*

Plaintiff states in his affidavit that on August 5, 2010, he "reviewed his medical files" and asked Ms. Nelson[11] to check and see if his medications were in yet. Plaintiff's affidavit, at 6. After checking with the pharmacy, she advised they were not in, "nor was the prescription sent out." *Id.* Later that same day Plaintiff declared a "medical emergency due to his high blood pressure symptoms . . . ." *Id.*

Defendant's records reveal that on August 5, 2010, Plaintiff declared a medical emergency. Ex. F (doc. 35-6). Plaintiff told Nurse Rebecca Zander that he had been without his blood pressure medication, Atenolol,[12] for three months and that he had been "unable to get through the tower to come to medical until he signed up for sick call." *Id.* Plaintiff's blood pressure at the time was 160/98, and Plaintiff complained that he was experiencing a migraine headache, blurred vision, and dizziness. *Id.* In Plaintiff's declaration, he adds that he was "having chest pains; numbness in his left

---

[11] There is no information provided as to the identity of Ms. Nelson, where she worked at the institution, or how she would have been in a position to provide that information to Plaintiff.

[12] The SOAPE form states that Plaintiff reported being without Atenolol, although the medication Plaintiff had been prescribed was Enalapril. Both medications are used to treat high blood pressure. www.drugs.com. It is unknown whether Plaintiff misreported his medication or the nurse did not accurately reflect the correct medication.

arm; lightheadedness; his pain level increased passed what he had felt in the months of May, June, July; vomiting while awaiting the prescription." Plaintiff's affidavit at 7. Those additional complaints, however, are not listed in the medical record.

According to the medical records, the nurse contacted the Defendant who verbally directed the nurse to provide Plaintiff with .2 milligrams of Clonidine. Ex. C (doc. 35-3 at 1); *see also* Ex. G at 2 (Defendant's affidavit). Nurse Zander immediately gave Plaintiff the Clonidine and his blood pressure came down to 134/84 and his other symptoms abated. Ex. F (doc. 35-6). The next day, August 6, 2010, Plaintiff received a 120-pill supply of "Enalapril DOH 60 CT" and again on December 2, 2010, both of which indicate the prescribing person was ARNP MacDonald.[13] Ex. H at 1 (doc. 35-8).

According to Plaintiff's declaration concerning the medical emergency, "Nurse Zander check[ed] the pharmacy for Plaintiff's medication and it was not there so she gave Plaintiff .2 milligrams of Clonidine which in twenty minutes, subsided symptoms." Plaintiff's affidavit at 7. Plaintiff points out that Defendant's own medical records show that the "only prescription Defendant ever prescribed Plaintiff was Ibuprofen 600 mg. on 3/18/11; 4/22/11; and 5/23/11." *Id.* at 7, *citing* to Doc. 35, Ex. H at 2.

As additional evidence, Plaintiff submitted the affidavit of inmate Adrian Smith who states that for two or three months, Plaintiff "had been complaining that he has been [sic] issued his medication by medical and had not receive[d] it." Doc. 37, Ex. C. Smith states that Plaintiff was "having bad headaches; throwing up; pain in his left arm; dizziness and heat flashes." *Id.* Smith confirmed that on August 5, 2010, Plaintiff was

---

[13] The July 20, 2010, prescription for Enalapril and Albuterol clarifies that C. MacDonald, ARNP, was employed at Wakulla C.I. Annex. Ex. C (doc. 35-3 at 1).

"given a pass for medical due to his blood pressure being high." *Id.* He said that Plaintiff "had thrown up and he had pain in his left arm." *Id.*

Another affidavit provided by Plaintiff is from inmate Sylvester Brown who stated that Plaintiff had told him that he took high blood pressure medication, but that "medical had not placed [him] on the call-out to pick up his refilled prescription." Doc. 37, Ex. B. A third affidavit from inmate Cecil Fisher stated: "On August 5, 2010, [Plaintiff] started vomitting [sic] in my room, complained of a migran [sic] headac [sic], pain in his left arm, and he was [illegible] very bad so I helped him to the officer station where he was given a pass for medical." Doc. 37, ex. D.

Defendant Torres-Gonzales submitted an affidavit in which Defendant notes that when Plaintiff arrived at Wakulla C.I. on November 12, 2009, his blood pressure was 134/90. Ex. G at 1 (doc. 35-7). Defendant personally evaluated Plaintiff approximately five months later, on April 27, 2010, and his blood pressure was 140/80 at the time. Defendant said: "The change in Inmate Benton's blood pressure from 134/90 to 140/80 during the course of five months did not significantly concern me, because the change was not considerable, and blood pressure can fluctuate daily." *Id.*

Defendant reiterates that on April 27, 2010, Plaintiff's prescription for Enalapril was renewed for one year. *Id.* at 2. Defendant said:

> I am not a pharmacist, and am not responsible for actually providing Inmate Benton's medication to him. I am a physician, and my responsibility is to diagnose ailments, and while I prescribe treatment for those ailments, such as a prescription for Enalapril in this situation, I am not responsible for physically providing the remedy which I prescribed.

Ex. G at 2. Defendant explained the process in the Department of Corrections is that once the doctor writes a prescription, "a nurse will collect the prescription and provide it

to the Department's pharmacy to be filled." *Id.* "Once the prescription is filled, the inmate will then collect the actual medication locally at a window staffed by nurses and other medical assistants, known as a 'pill line.'" *Id.* Doctors are not involved in that process and, unless a prescription came back because it could not be filled or some issue occurred concerning a medication, the prescribing doctor "would never know if a problem occurred with the prescription." *Id.* Furthermore, in response to Plaintiff's allegations in the amended complaint, Defendant flatly denies telling Plaintiff "you are wasting my time," that no changes would be made to Plaintiff's medication, and threatening Plaintiff that if he continued to pester the Defendant, "your prescription may not get filled." *Id.*

## III. Analysis

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), *quoting* Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977). Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm." Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009), *citing* Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th

Cir. 2003). On this first element that must be proven by an inmate asserting an Eighth Amendment claim, it is concluded that Plaintiff had an objectively serious medical need because hypertension, "if left unattended, pos[es] a substantial risk of serious harm." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotations omitted); *accord* Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (stating that "serious medical needs are those requiring immediate medical attention.") (quotations omitted). The need to treat high blood pressure is obvious even to a lay person.

> Even if an inmate can establish that he suffered from a serious medical need, he must further prove that the allegedly offending prison official acted with an attitude of "deliberate indifference" to that need in order to succeed on his claim. Estelle, 429 U.S. at 106, 97 S.Ct. 285. This means, as the Supreme Court later clarified in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), that the inmate must demonstrate that the official had subjective knowledge of a risk of serious harm and consciously disregarded that risk. *Id.* at 837, 114 S.Ct. 1970 ("We hold . . . that a prison official cannot be liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . . "). Inquiry into the prison official's state of mind is consistent with the plain import of the Eighth Amendment's prohibition on cruel and unusual "punishments"—not cruel and unusual "conditions." Farmer, 511 U.S. at 837, 114 S.Ct. 1970 . . . .

Loadholt v. Moore, 844 F.Supp.2d 1274, 1279-80 (S.D. Ga. 2012). Put another way, once a prisoner shows that he has a serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004), *citing* McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999).

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.

Farmer, 114 S. Ct. at 1978). Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need. Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). Medical malpractice does not constitute deliberate indifference. Estelle, 429 U.S. at 106, 97 S. Ct. at 292. "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). *See also* Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993). An "official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." McElligott, 182 F.3d at 1255, *citing* Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989).

In this case, the evidence reveals that Plaintiff's only interaction with the Defendant occurred on April 27, 2010, when Defendant Torres-Gonzalez evaluated Plaintiff in what appears to be a routine examination for his chronic illnesses (asthma and hypertension). At the time of the examination, Plaintiff's blood pressure was 140/80, which was admittedly elevated, but not life threatening and not a significant change from his 134/90 pressure when he arrived at Wakulla C.I. in November 2009. The Defendant determined that Plaintiff should continue with the same medications he had been receiving and on the same day as the examination, the Defendant wrote a prescription for Enalapril and Albuterol for one year. In the Defendant's medical

opinion, Plaintiff's condition was sufficiently controlled with the medication he had been on for a period of time. Accepting Plaintiff's evidence as true and viewed in the light most favorable to him, Plaintiff has shown that the Defendant was upset with Plaintiff for wanting a different medication and made comments to Plaintiff that were not warranted and were unprofessional, but not unconstitutional. To the degree Plaintiff's complaint *could* be deemed to challenge the medication prescribed, there is no valid Eighth Amendment claim in this context as that is nothing more than a dispute about the course of treatment and a difference in opinion between Plaintiff and Defendant.

Viewing the evidence in the light most favorable to Plaintiff, he was seen in sick call by Nurse Clardy on July 17, 2010, and advised that he had been unable to receive his medication. Nurse Clardy said he would send for Plaintiff's medication, but there is no evidence that occurred. That omission is not attributable to the Defendant and, moreover, demonstrates a prescription had been written.[14] There is, admittedly, a conflict in the evidence as to what took place when Plaintiff went to sick call on July 17th, and the reason for Plaintiff's visit. Defendant's evidence demonstrated that Plaintiff reported sinus problems, stuffy nose, and wanted a refill of Claritin, but did not mention a problem with the blood pressure medication. Plaintiff, on the other hand, contends he went to sick call to report that he had not received his blood pressure medication in two months. While that may be viewed as a conflict, it is not material to the outcome of this case for several reasons.

---

[14] Plaintiff's own evidence supports finding that Plaintiff had a valid prescription because when he spoke with Nurse Clardy on July 17, 2010, the nurse told Plaintiff "the prescription was never filled, but that he would send for it." Plaintiff's affidavit, at 6. That statement indicates a prescription was written, just not filled.

First, the undisputed evidence reveals that on the same day as that examination took place, April 27, 2010, the Defendant renewed the prescriptions for Plaintiff for one year. The only evidence before this Court is that after a doctor writes a prescription, a nurse collects the prescription and provides it to the pharmacy to be filled. A doctor is not a pharmacist and does not "fill" prescriptions. Thus, Defendant did all that was required and any subsequent problem that occurred with Plaintiff being unable to receive his medication has not been shown to be attributable to the Defendant. Plaintiff *should* have been able to obtain his medication at the "window staffed by nurses and other medical assistants, known as a 'pill line.'" Had Plaintiff not been able to do so, it was incumbent on Plaintiff to promptly alert someone in medical of his problem. Plaintiff's inability to obtain his blood pressure medication, however, has not been shown to be a result of any act or omission by the Defendant.

Furthermore, a 30-day supply of Enalapril was filled on April 29th, *after* Plaintiff was seen by the Defendant. For an unknown reason, the pharmacy lists the prescribing doctor not as the Defendant, but M. Nichols. Nevertheless, Plaintiff was provided the medication and received another refill on May 27th, also prescribed by Nichols, which should have lasted until the end of June 2010.

Moreover, Plaintiff did not submit an Inmate Request form until July 29, 2010, providing written notice that he had not been able to come to medical and had not received his blood pressure medicine. The August 2, 2010, response directed Plaintiff to review the bulletin board, the inmate manual, or ask a dorm officer for the proper procedure to attend sick call. Plaintiff still did not go to sick call but waited three more days to declare a medical emergency. While Plaintiff has provided some evidence that

he attempted to notify *some* medical personnel of his problem on June 22, 2010, and July 17, 2010, and he submitted one Inmate Request on July 29, 2010, it is undisputed that Plaintiff did not provide the Defendant with notice of any problem. Absent evidence that at some point the Defendant was aware that the prescription she had written had not been filled, the Defendant is not liable and was not deliberately indifferent to Plaintiff's medical needs.[15]

Furthermore, when the Defendant was notified by Nurse Zander of Plaintiff's elevated blood pressure on August 5th, Defendant verbally directed that Plaintiff be provided Clonidine. The evidence reveals that was done immediately and his blood pressure came down to 134/84. There is no evidence that the Defendant was indifferent to Plaintiff's needs.

It is also undisputed that Plaintiff had not one, not even two, but three prescriptions written for his high blood pressure during the relevant period of time. In November 2009, a prescription was written by M. Nichols which, presumably, was for a year and should have lasted until November 2010, well past the August 5, 2010, incident. The second prescription was written by the Defendant on April 27, 2010, for one year, overlapping the period of time provided by the Nichols' prescription. A third prescription was written on July 20, 2010, by ARNP MacDonald for the same medication, also overlapping the earlier prescriptions. Even if there was a problem with the prescription written by the Defendant, Plaintiff *should* have been able to obtain this

[15] Because the Defendant is a doctor and not a pharmacist, the Defendant is not responsible for "filling" Plaintiff's prescription that, undisputably, the Defendant wrote in April 2010. Thus, there is no causal connection between the Defendant and Plaintiff's injury (the 160/98 blood pressure in August 2010 and related problems).

medication considering the fact that three prescriptions were written for the medication within nine months time. Thus, because there was a valid prescription written both before and after the Defendant's prescription, the Defendant cannot be held liable for Plaintiff's inability to receive his prescribed medication.

In sum, whatever problem existed in the pharmacy's filling of a prescription, or in Plaintiff's ability to retrieve it, has not been shown to be attributable to the Defendant. Defendant prescribed the medicine and was not indifferent to Plaintiff's medical needs. Therefore, Defendant's summary judgment motion should be granted and judgment entered in the Defendant's favor.

**Recommendation**

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion for summary judgment, doc. 35, be **GRANTED**, and judgment entered in favor of the Defendant on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious medical needs.

**IN CHAMBERS** at Tallahassee, Florida, on February 11, 2013.

S/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**